COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

 

NUMBER 13-04-224-CV

 

G. XAVIER MONTEMAYOR AND 

FRANKLIN T. GRAHAM,
JR.,                                    Appellants,

 

                                           v.

 

BECKY
ORTIZ, D/B/A SCHORS,                                   Appellee.

 

 

 

NUMBER
13-04-358-CV

 

G. XAVIER MONTEMAYOR AND 

FRANKLIN T. GRAHAM,
JR.,                                    Appellants,

 

                                           v.

 

JOSE ANTONIO ORTIZ FERNANDEZ, 

JOSE ANTONIO ORTIZ CELADA, 

AND WIFE, BECKY ORTIZ,                                        Appellees.

 

 

 

                  On appeal from the 138th
District Court

                          of Cameron
County, Texas.

 

 

 








                              O P I N I O N

 

                     Before Justices Hinojosa, Yañez, and
Castillo

                                  Opinion by Justice Castillo

 

These two appeals were
consolidated for the purposes of briefing and argument, and will now be
addressed in a single opinion.  Cause
number 13-04-358-CV began as a declaratory judgment action filed on May 15,
2002, by appellants, G. Xavier Montemayor and Franklin T. Graham, Jr.
(collectively "Montemayor"), against appellees Jose Antonio Ortiz
Fernandez ("Fernandez"), his son Jose Antonio Ortiz Celada
("Celada") and Celada's wife, Becky Ortiz ("Ortiz").  Montemayor desired to collect on a monetary
judgment against Fernandez and Celada that issued in 1990, and sought a
declaratory judgment that properties of Schor's, a d/b/a of Ortiz, were
community property of Celada and Ortiz and therefore subject to levy and
execution for payment of the judgment debt. 


In conjunction with
the petition for declaratory judgment, and without notice to Ortiz, Montemayor
sought and obtained a temporary restraining order and an ex parte
receivership.  Ortiz filed counterclaims
on January 10, 2003, alleging that the ex parte receivership was obtained
wrongfully, based on misrepresentations to the court, and had damaged her and
her business.  Causes of action included
abuse of process, malicious prosecution, defamation, and intentional infliction
of emotional distress.  








Two partial summary
judgments were entered in favor of Ortiz in 2003 in the declaratory judgment
action reflecting:  (1) the 1990 judgment
was for collection of a debt, not a tort; and (2) Schor's was the "special
community property" of Ortiz, at all times subject to her sole management
and control, and not subject to levy or execution by Montemayor.  Subsequent to entry of the two summary
judgment orders, the counterclaims of Ortiz were severed (now cause number 13-04-224-CV
on appeal).  The severed action dealing
with the damage claims proceeded to trial in August 2003; final judgment
consistent with the jury verdict in favor of Ortiz issued in February
2004.  At that point, Ortiz returned to
court in the declaratory judgment action and obtained an award for attorneys'
fees.  Final judgment in that case issued
in favor of Ortiz on April 19, 2004.

Appeal is brought from
the orders granting the summary judgments, and from the findings and judgment
in the severed action, concluding that Montemayor engaged in tortious conduct
and awarding damages.  We affirm the
trial court's rulings reflected in appeal number 13-04-358-CV.  We reverse the trial court's judgment in
appeal number 13-04-224-CV, based upon no evidence to support the
findings, and render. 

I.  Background








In the mid 1980's,
Fernandez and Celada had done business with the Brownsville Money
Exchange.  In 1986, they sought the
immediate exchange of $140,000 in pesos for American dollars to satisfy some
other debts.  They received a check from
the exchange; they then contacted it to advise that the check would not clear
soon enough.  They requested that
$140,000 be forwarded by wire and they would return the check.  The money was wired; the check was also
deposited.  After some dispute, but without
litigation, Fernandez and Celada agreed to execute four promissory notes for
the additional $140,000 in favor of the Brownsville Money Exchange.  They failed to pay on those notes; litigation
ensued, and in June 1990, a judgment was entered against Fernandez and Celada
for $203,013, with interest at the rate of eighteen percent per year until
paid.  That judgment was later assigned
two-thirds to Montemayor (son of the owner of the exchange) and one-third to Graham
(the attorney who handled the matter on behalf of the exchange and retained a
contingency fee interest). 

When still a
newly-wed, Ortiz began Schor's in 1977 in partnership with her
sister-in-law.  The initial capital
investment was $15,000; Ortiz contributed $7,500 given to her as a gift from
her father.  The sister-in-law was not
interested in operating the business, which grew largely due to the efforts of
Ortiz.  Schor's expanded into two stores,
operating as a jewelry store and interior decorating business.  Ortiz bought out her sister-in-law in the
early 1990s with monies earned from the business.  During this time, Celada allegedly had
nothing to do with the Schor's business; he focused on farming operations with
his father in Mexico.  Ortiz was aware
that in the late 1980s, Celada and Fernandez started an unsuccessful steel
business.  She testified she was aware of
financial difficulties, but not immediately aware of the promissory notes
executed on behalf of the Brownsville Money Exchange.  In 1990, Fernandez filed for Chapter 7 protection
in bankruptcy.  The principal amount of
the 1990 judgment debt against him for $140,000 was not discharged, based on a
finding by the bankruptcy court that the debt had been incurred through fraud.  








Ortiz continued to
reinvest profits from Schor's into the business, which grew to have an
inventory value in excess of one million dollars by 2002.  She contended at all times that Schor's was
subject to her sole management and control, as either her separate or special
community property, and that she and Celada separately managed their own
business affairs.  By 2002, Celada was
not contributing to maintenance of the family, was absent much of the time,
living in Mexico, and the couple initiated divorce proceedings.  

In May 2002, Montemayor
and Graham approached counsel about possibly collecting on the 1990 judgment
against the Schor's property.  Various
unsuccessful attempts had been made to collect in the intervening years;
frequently Celada could not be located for service.[1]  Graham also testified that they did not
earlier pursue the Schor's assets because the business was not initially big
enough to fight about.  By 2002, the 1990
judgment had grown, through accruing interest, to have a value in excess of
$1,450,000.[2]  








Montemayor filed a
petition on May 15, 2002, requesting a temporary restraining order to
"preserve the status quo," to prevent Fernandez, Celada or Ortiz from
concealing or hiding assets of Schor's. They also sought and secured an ex parte
appointment of a receiver, based upon affidavits which alleged imminent threat
that the assets would otherwise disappear, and that Schor's was the community
property of Celada and Ortiz and therefore subject to execution to satisfy the
debt.  The order appointing the receiver
reflects that, in the petition, Montemayor contended that if emergency relief
were not granted, the "assets and cash of said store [Schor's] will be
concealed, transferred, removed, assigned, sold or hidden and that the Plaintiffs
will be forever and irreparably injured . . . ."  The order appointed Rufus Ransome, Jr.,
("Ransome") as "receiver of the inventory (including the
jewelry, antiques, and merchandise), equipment, cash on hand, accounts
receivable, and cash accounts or other depository accounts" of
Schor's.  

Ransome appeared at
the store's facility on May 15, 2002, with order in hand.  Store employees contacted Ortiz, who was
shocked, but granted admittance and told employees to cooperate.  Some other family member contacted Celada,
who then appeared at the store, got into an altercation with Ransome, and told
him to leave.   Ransome left.  Ortiz contacted an attorney, Dennis Sanchez,
who immediately contacted counsel for Montemayor.  An agreed order was negotiated and formally
entered on May 28, 2002.  It reflects
that, based on representations that Fernandez and Celada would not be permitted
access to Schor's and that no assets of Schor's will be transferred to them,
Ortiz would be permitted to continue operating her business, buying and selling
merchandise and conducting normal operations.[3]  Under the agreement, the receiver would
complete his inventory of all assets, and would have authority to review all
purchases and sales, which he could stop at his own discretion. 








At a hearing held June
7, 2002, the temporary restraining order was dissolved and replaced by a
temporary injunction.  The parties agreed
the receivership would remain in place: "It is our agreement that Mr. Ransome
will be able to continue to view the books and records, and look at the
inventory, and examine the inventory on a weekly basis. . . .  But if he believes something irregular is
occurring such as looting of assets, or something like that, then he would have
the right to come back and advise the Court and counsel."  Ortiz was permitted to continue normal
operations of her business.  A formal
order to this effect was entered June 24, 2002; however, this order was not
"agreed" as some additional language was included.  

In October 2002, Ortiz
moved to dissolve the receivership; it was formally vacated on January 8,
2003.  Ortiz also moved for two partial
summary judgments.  Partial summary judgment
that the 1990 judgment was an action for debt, and not based in tort, was
entered on February 21, 2003.  Partial
summary judgment that Schor's was at all times Ortiz's "special community
property," subject to her sole management and control and not available
for attachment to satisfy the 1990 judgment debt, was entered on May 27,
2003.  

On August 11, 2003,
the declaratory judgment action was severed from Ortiz's counterclaims for
damages.  Trial on the damage claims
commenced on August 12, 2003.  The jury
verdict was entered August 22, 2003, awarding actual damages to Ortiz.  The trial was bifurcated; punitive damages
were awarded in an August 26, 2003, verdict. 
Final judgment was entered on the damage claims on February 5, 2004.  Ortiz then returned to court in the
declaratory judgment action, had a trial on attorneys' fees, and final judgment
in that matter was entered in favor of Ortiz on April 19, 2004.  

II.  The Declaratory Judgment CaseBThe Summary Judgments








Montemayor raises four
issues on appeal relating to entry of the summary judgment orders.  These orders arise in appeal number
13-04-358-CV.  Issues one, two, and three
involve the order concluding Schor's assets were the "special community
property" of Ortiz, and not subject to any liability for the 1990
judgment.  Montemayor contends the trial
court erred because (1) they were jointly managed assets of Ortiz and Celada
(issue one), (2) issues of material fact remained as to the nature of the
property (issue two), and (3) issues of fact precluded summary judgment that
the 1990 judgment was not the "joint debt" of Ortiz and Celada (issue
three).  In issue four, Montemayor
contends that the trial court erred in finding that the 1990 judgment was based
on contract and not in tort because material fact issues remained that required
resolution by a jury. 

A.  Summary JudgmentBStandard of Review








The function of a summary judgment is to eliminate
patently unmeritorious claims and defenses, not to deprive litigants of
the right to a jury trial.  Alaniz v.
Hoyt, 105 S.W.3d 330, 344 (Tex. App.BCorpus Christi 2003, no pet.).  The propriety of a summary judgment is a
question of law.  See Natividad v.
Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994).  We therefore review de novo a trial court's order
granting a traditional motion for summary judgment.  See id.
 We review the evidence "in the
light most favorable to the nonmovant, disregarding all contrary evidence
and inferences."  See KPMG
Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748
(Tex. 1999); Branton v. Wood, 100 S.W.3d 645, 646 (Tex. App.BCorpus Christi 2003, no pet.).  The movant bears the burden of showing
both no genuine issue of material fact and entitlement to judgment as
a matter of law.  Tex. R.
Civ. P. 166a(c); Hoyt, 105 S.W.3d at 345.  In deciding whether a genuine issue of
material fact exists, we take evidence favorable to the non‑movant as
true.  Ortega v. City Nat'l Bank,
97 S.W.3d 765, 772 (Tex. App.BCorpus Christi 2003, no pet.).  We make all reasonable inferences and resolve
all doubts in favor of the non‑movant. 
Id.  A non‑movant
has the burden to respond to a traditional summary judgment motion if the
movant conclusively (1) establishes each element of its cause of action or
defense, or (2) negates at least one element of the non‑movant's cause of
action or defense.  See id. 

We affirm a trial court's ruling on a summary
judgment motion if any of the theories advanced in the motion is
meritorious.  State Farm Fire
& Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993); Boren v. Bullen,
972 S.W.2d 863, 865 (Tex. App.BCorpus Christi 1998, no pet.). 

B.  Summary Judgment that 1990 Debt is Based in
Contract

Montemayor's fourth
issue challenges the trial court's finding that the underlying 1990 judgment
was for a debt in contract, rather than a judgment in tort.  Preliminary resolution of this issue is
crucial because, pursuant to section 3.202 of the Texas Family Code, unless
both spouses are personally liable,[4]
community property that is subject to one spouse's sole management, control,
and disposition is not subject to nontortious liabilities that the other spouse
may incur before or during marriage.  Tex. Fam. Code Ann. ' 3.202 (Vernon
1998).  








Ortiz moved for
summary judgment, requesting the trial court to declare the 1990 judgment to
have been based on a promissory note and not a judgment in tort.  She asserted that any attempt to argue
otherwise was barred by res judicata, collateral estoppel, and statute of
limitations.  The judgment itself reads:

The court here finds
that the defendants, JOSE ANTONIO ORTIZ FERNANDEZ and JOSE ANTONIO ORTIZ
CELADA, executed Four (4) Promissory Notes, . . . payable to the order of
Plaintiff [Brownsville Money Exchange] . . . The Court further finds that each
of the Four (4) Notes provided for interest . . . .  The Court further finds that the Plaintiff
found it necessary to engage the services of an attorney to effect collection
and that under the terms of said Notes the Defendants . . . are liable for
fifteen percent (15%) of the principal and interest due as an attorneys' fee,
which the Court here finds to be reasonable, and which the Court here finds to
total . . . $26,479.95.

 

The judgment awarded
$203,013.00 in principal (including accrued interest), interest forward until
the date paid at the rate of eighteen percent (18%), and attorneys' fees. 

Graham
testified that the suit on the judgment did not involve Ortiz.  He also testified that they did not urge tortious
conduct in the underlying suit because it was not necessary.  Montemayor nevertheless contends that the
underlying judgment was based upon tortious, fraudulent conduct committed by
Fernandez and Celada in 1986, and that this was confirmed by the bankruptcy
court when it refused to discharge the debt against Fernandez.  Montemayor urged the trial court to defer to
the bankruptcy court's finding, and argued that fact issues remained as to
whether Ortiz was a party to the fraud because she allegedly received $10,000
of the monies from the missing $140,000. 









The
1990 judgment clearly sets forth that it was based on the failure to pay
promissory notes.  There is no mention of
tortious or fraudulent conduct, despite the fact that tortious conduct was
alleged to have taken place in 1986. 
Testimony of Graham confirms that no issues as to fraud were raised in
securing the judgment on the notes. 
There is no dispute as to the contentions raised before the court in
securing the 1990 judgment.  The judgment
clearly applies only to Fernandez and Celada. 
The judgment also awards attorneys' fees, consistent with the terms of
the notes and with an action to collect on either a sworn account or an oral or
written contract.  See Tex. Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon
1997).  Attorneys' fees are not
recoverable in an action in tort. 
Knebel v. Capital Nat'l Bank, 518 S.W.2d 795, 803-04 (Tex. 1974)
(citing New Amsterdam Cas. Co. v. Tex. Indus., Inc., 414 S.W.2d 914, 915
(Tex. 1967)).  








"Under
res judicata, a final judgment on the merits of an action precludes the parties
or their privies from relitigating issues that were or could have been raised
in that action."  John G. &
Marie Stella Kenedy Mem. Found. v. Dewhurst, 90 S.W.3d 268, 287 (Tex. 2002
) (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)).  "[W]hen a court of competent
jurisdiction has entered a final judgment on the merits of a cause of action,
the parties to the suit and their privies are thereafter bound 'not only as to
every matter which was offered and received to sustain or defeat the claim or
demand, but as to any other admissible matter which might have been offered for
that purpose.'"  Id.  Further, while neither res judicata nor
collateral estoppel will bar an action for fraud where such an action could not
have been asserted in the underlying proceedings, such is not the case
here.  All facts upon which allegations
of fraud are based were well known at the time judgment was sought on the
notes.[5]  Additionally, nearly twelve years passed
between the time of entry of the judgment (June 19, 1990), and Montemayor's
filing of suit seeking to attach assets of Schor's.  All time periods within which a judgment
might be reformed, modified, or corrected, whether by motion to modify, a
motion for new trial, or bill of review had expired long before May 2002.  See Tex.
R. Civ. P. 329b.  Further, no such
efforts to modify the judgment were ever undertaken.  See also Murray v. San Jacinto Agency, Inc.,
800 S.W.2d 826, 828 (Tex. 1990) ("The purpose of a statute of limitations
is to establish a point of repose and to terminate stale claims.").  

We
conclude that the trial court properly determined in its order for partial
summary judgment, which issued February 21, 2003, that the underlying 1990
judgment "was one for debt and Plaintiffs are barred from claiming it is
for tort by res judicata, collateral estoppel and statute of limitations."  We overrule Montemayor's fourth issue on
appeal. 

C.  Summary JudgmentBSpecial Community
Property

1.  The Judgment








Ortiz
filed a separate motion for partial summary judgment in February 2003,
requesting a declaration that Schor's was not community property and was not
subject to attachment for the 1990 judgment debt.  As exhibits, Ortiz included (a) affidavits
explaining how Schor's had begun with the gift of $7,500 from her father, with
the intent that it be her property; (b) deposition testimony of her accountant,
Ygnacio Garza, who had handled tax filings for the partnership between Ortiz
and her sister-in-law until it was dissolved, and who testified that Celada
never signed checks, secured loans, or otherwise participated in the business
of Schor's; (c) deposition testimony of Celada reflecting that he considered
Schor's as Ortiz's separate property, always under her management and control,
and that he had no participation in the business whatsoever; (d) copies of the
assumed name certificates for Schor's, reflecting Ortiz as its owner; and (e)
excerpts from Montemayor's deposition reflecting he had no personal knowledge
of Celada's involvement in any of Schor's business affairs, other than hearsay
that he occasionally assisted in hanging window blinds.

Montemayor
countered with Ortiz's admission that profits from Schor's were reinvested into
the business.  He urges that, pursuant to
Cockerham v. Cockerham,  527
S.W.2d 162 (Tex. 1975), because community assets (the profits) were reinvested
into Schor's, it lost its separate or special nature and became a community
asset, subject to attachment for the judgment debt.  Montemayor also urges that Ortiz and Celada
filed joint tax returns, mutually taking advantage of depreciation or losses as
well as profits from each other's businesses, and that Ortiz used funds of
Schor's to maintain the household and family expenses.  Montemayor contends these actions establish
that Schor's is community property. 








The
trial court concluded in its order of May 27, 2003, that all assets of Schor's
during the marriage of Celada and Ortiz were the special community property of
Ortiz, subject to her sole management, control and disposition, and were never
subject to the liability of Celada reflected in the 1990 judgment.  "The Schor's properties were not, and
are not subject to levy and execution by [Montemayor] based upon the above
judgment debt which this Court has already found to be, as a matter of law, a
nontortious judgment debt based on promissory notes."  We further note that, in concluding Schor's
was the separate community property of Ortiz, and that those assets were not
subject to levy and execution for Montemayor's judgment, the trial court
necessarily concluded that Ortiz was not personally liable for the debt along
with Celada.  See Tex. Fam. Code Ann. ' 3.202 (Vernon
1998).  

2.  Analysis

We review the trial court's
granting of the motion for summary judgment de novo, Natividad, 875
S.W.2d at 699, viewing the evidence "in the light most favorable to the
nonmovant, disregarding all contrary evidence and inferences."  KPMG Peat Marwick, 988 S.W.2d at
748; Branton, 100 S.W.3d at 646.  

In
his first and second issues, Montemayor challenges the trial court's conclusion
that Schor's was the special community property of Ortiz; in his third issue,
he challenges the conclusion that the 1990 judgment was not a joint debt of
Ortiz and Celada.  

Texas
recognizes both sole and joint-managed community property.  Tex.
Fam. Code Ann. ' 3.102 (Vernon 1998); Douglas
v. Delp, 987 S.W.2d 879, 883 (Tex. 1999). 
Sole-management community property is that property which, though
acquired during the marriage, would have belonged to that spouse if single.  Douglas, 987 S.W.2d at 883.  The trial court's decision also rests on
application of family code section 3.202, which provides that marital property
subject to the sole management, control and disposition of one spouse will not
be subject to any nontortious liability of the other spouse.  Tex.
Fam. Code Ann. ' 3.202 (Vernon
1998).  The court, as noted above,
concluded the judgment in issue was a "nontortious" liability. 








There
is no dispute that the business of Schor's began subsequent to the marriage of
Ortiz and Celada and grew during the term of their marriage.  It began with a gift of monies from Ortiz's
father to her, and operated as a separate partnership until the early
1990s.  Evidence before the trial court
demonstrated that Ortiz did control the business of Schor's, and that Celada
had no input in its management or operations, and no direct access to checks or
other financial aspects of the business. 
No evidence other than speculation was tendered to suggest
otherwise.  

However,
our analysis does not end here.  There is
no dispute that profits from Schor's were reinvested into the business to assist
in its growth.  Additionally, it is
undisputed that income from Schor's was used to fund family expenses.  Montemayor contends that, pursuant to Cockerham,
527 S.W.2d 162, any independent management of the asset does not overcome the
fact that the use of community assets (i.e., the profits of Schor's)
transformed Schor's into a jointly managed community property of Ortiz and
Celada.  Montemayor further urges that
the continued investment and reinvestment of business profits resulted in a
commingling making it impossible to trace the value of any separate property,
and the statutory presumption of community property therefore prevails.  See Jones v. Jones, 890 S.W.2d 471,
475 (Tex. App.BCorpus Christi 1994,
writ denied).  

Ortiz
counters that Cockerham is distinguishable.[6]  Section 3.102 of the family code provides
that, during marriage, a spouse has the sole management, control and
disposition of the community property that the spouse would have owned if
single, including "(1) personal earnings; (2) revenue from separate
property; (3) recoveries for personal injuries; and (4) the increase and
mutations of, and the revenue from, all property subject to the spouse's sole
management, control and disposition." 
Tex. Fam. Code Ann. ' 3.102 (Vernon 1998)
(emphasis added).  








Cockerham involved a circumstance where the wife had filed for divorce and then
filed for chapter 7 bankruptcy because of her failed dress shop business.  Cockerham, 527 S.W.2d at 164.  The bankruptcy trustee intervened in the
divorce to determine whether assets of the husband's dairy business could be
attached to satisfy creditors of the dress shop.  Id. 
It was undisputed that the dairy business had been operated
independently of Mrs. Cockerham, id. at 168, and her dress shop had
little or no participation from Mr. Cockerham, id. at 171.  Analysis centered on whether the dairy business
was accessible community property or whether it had remained under the sole
management, disposition and control of Mr. Cockerham, with no commingling of
its assets, such that it remained "special community property" that
could not be reached by the creditors. 
As with Schor's here, the dairy business was a sole proprietorship of
the husband and debts of the dress shop had not been jointly incurred.  Id. at 168-70.  However, other facts diverge.








In
Cockerham, the husband owned an undivided one-half interest in a
320-acre tract, along with his brother, prior to his marriage.  Id. at 167-68.  As such, his interest was his separate
property.  Cockerham and his wife later
purchased his brother's one-half interest in the property through a convoluted
transaction that ended up with a conveyance to both husband and wife.  Id. at 168.  The supreme court agreed that at all times,
an undivided one-half interest in the property remained the separate property
of Mr. Cockerham.  Id.  Testimony reflected no intent to gift the
wife with an interest in the land.  The
one-half interest in the property was clearly traced and was adequate to rebut
the presumption that all interest in the property became community at the time
the other one-half interest was purchased. 
Id.  The trustee therefore
claimed a community interest in the remaining one-half interest, and in the
dairy business.  

The
dairy business was located on the 320-acre tract.   Mr. Cockerham urged that the dairy business
had at all times been subject to his sole management and control, and relied
upon the predecessor to section 3.102 of the family code,[7]
much as Ortiz does here.  Id. at
170.  However, facts reflected that Mr.
Cockerham and his wife effectively borrowed the cash necessary to purchase the
community interest in the property, and title transferred into the name of
each.  The court considered this
sufficient to establish that the community interest in the undivided one-half
of the 320 acre tract was subject to the joint management of each.  Id. 


With
respect to the dairy business, it was acquired during the marriage, and its
proceeds were reinvested into the business. 
Id. at 170.  Again, the
distinction in how the land was acquired meant that proceeds of the dairy
business were acquired not just by the labor of the husband by also by virtue
of capital improvements that were community property.  Id. 
Therefore, the dairy business was also under the joint management and
control of each, and subject to attachment for debts of the dress shop, whether
those obligations were of only the wife or joint obligations of each.  Id. at 171.  








We
find Cockerham to be distinguishable from the matter before us.  Here, unequivocal evidence reflected not only
that Ortiz maintained full control over management and operations of Schor's,
but also that no community capital assets were used to increase the business of
Schor's.  Schor's was initially purchased
with Ortiz's separate property.  Profits
from Schor's were directly reinvested into Schor's, without prior commingling
into community bank accounts.  No debts
were incurred or monies borrowed by both Ortiz and Celada to finance further
growth of Schor's.  Schor's did not grow
by virtue of the infusion of other community funds.  Schor's did not rely upon any community-owned
real property.  All investments into
Schor's derived from "the increase and mutations of, and the revenue from,
all property subject to the spouse's [Ortiz's] sole management, control, and
disposition."  Tex. Fam. Code Ann. ' 3.102(a)(4) (Vernon
1998).  

In
construing a statute, our objective is to determine and give effect to the
Legislature's intent first by looking to the statute's plain and common
meaning.  Tex. Workers' Comp. Comm'n
v. Patient Advocates of Tex., 136 S.W.3d 642, 652 (Tex.  2004). 
Because Schor's remained under the sole management and control of Ortiz,
including any profits therefrom (whether or not some other portions of those
profits were then contributed to the community), we conclude that the trial
court properly determined that Schor's was the special community property of
Ortiz, not subject to any nontortious liabilities of Celada, not a joint debt,
and not subject to liability for the 1990 judgment debt.  Tex.
Fam. Code Ann. '' 3.102, 3.202 (Vernon
1998).  We overrule Montemayor's first,
second and third issues on appeal. 

III.  The Damage Claims








Ortiz
brought counterclaims against Montemayor for allegedly wrongfully pursuing the
business assets of Schor's and for harassing her.  After the trial court issued its two rulings
on Ortiz's motions for partial summary judgment, those counterclaims in which
Ortiz sought damages were severed from the declaratory judgment portion of the
suit.  

The
claims for damages based on wrongful conduct proceeded to a bifurcated trial in
August 2003.  On August 22, 2003, the
jury issued a verdict awarding actual damages to Ortiz in the amount of
$335,000.[8]  A supplemental verdict issued August 26,
2003, awarding punitive damages in the amount of $75,000.00 against Montemayor,
individually, and $100,000 against Graham, individually.  Final judgment incorporating these jury
verdicts was entered on February 5, 2004. 
Findings relating to these claims are appealed under cause number 13-04-0224-CV.


A.  Issues on Appeal

In
the consolidated appeal, Montemayor challenges the damages awards.  In issues 5-11, he asserts the trial court
erred as follows: 

(a) issue 5Bno evidence or legally
insufficient evidence of abuse of process;

 

(b) issue 6Bno evidence or
insufficient evidence of defamation; 

 

(c) issue 7Bno evidence or
insufficient evidence of intentional infliction of emotional distress; 

 

(d) issue 8Bno evidence or
insufficient evidence of malicious prosecution; 

 

(e) issue 9Bno evidence or
insufficient evidence of malice to support an award of punitive damages; 

 

(f) issue10Bno evidence or insufficient
evidence of mental anguish damages in tort; 








(g) issue 11Bno evidence or
insufficient evidence of any causal connection between alleged lost profits and
any act or omission of Montemayor; 

 

(h) issue12Bno evidence or
insufficient evidence to support award for damage to reputation.

 

The
claims for damages all derive from a central contention that Montemayor acted
wrongfully in securing the ex parte receivership.  We note that a trial court is statutorily
authorized to appoint a receiver in certain cases, including an action by a
creditor to subject any property or fund to its claim, on the application of
the plaintiff or any party whose right to or interest in the property or fund
or in the proceeds therefor is probable, and where it is shown that the
property or fund is in danger of being lost, removed or materially
injured.  See Tex. Civ. Prac. & Rem. Code Ann.
' 64.001 (Vernon 2005);
B & W Cattle Co. v. First Nat'l Bank of Hereford, 692 S.W.2d 946,
950 (Tex. App.BAmarillo 1985, no
writ).  A court may even appoint a
receiver on its own motion and without application of a party where the facts
justify the appointment to preserve and protect property in litigation.  Cross v. Cross, 738 S.W.2d 86, 87
(Tex. App.BCorpus Christi 1987,
writ dism'd w.o.j.). 








The
parties do not dispute that issuance of an ex parte receivership is a harsh
remedy to be exercised only in extraordinary circumstances.  See Indep. Amer. Sav. Ass'n v.
Preston, 753 S.W.2d 749, 750 (Tex. App.BDallas 1988, no writ); Tex. Consol. Oils v.
Hartwell, 240 S.W.2d 324, 327 (Tex. Civ. App.BDallas 1951, no writ); Parness v. Parness,
560 S.W.2d 181, 182 (Tex. Civ. App.BDallas 1977, no writ)
(each involving interlocutory appeals from the order appointing a receiver).[9]  However, even if a receivership were obtained
wrongfully, as is urged in this matter, whether or not a party may recover on
affirmative causes of action depends upon the elements of those causes of
action.

Ortiz
has never contended that the trial court erred or abused its discretion in
ordering the receivership, based upon the information before it.  No interlocutory appeal was taken from the
order granting the receivership, and no related issue is raised in this appeal.  In fact, Ortiz entered into two agreements to
extend the receivership in exchange for being able to operate her
business.  Ortiz contends she
specifically reserved her right to later challenge the receivership.  Although there were arguments before the
trial court as to whether any such challenge was waived, we have no such issue
before us on appeal.  Instead, we address
the issues raised, as they deal with the evidence tendered to support the
counterclaims raised by Ortiz.  

B.  Standard of Review








Montemayor claims there is
no evidence to support any of the jury's findings.  He challenges the legal sufficiency of the
evidence with respect to the claim for abuse of process.  With respect to all counterclaims except
abuse of process, Montemayor contends in the alternative that evidence is
"insufficient" to sustain the jury's findings, without specifying
whether he challenges the legal or the factual sufficiency of the
evidence.  

Inasmuch
as Montemayor's prayer requests first that we reverse and render and, in the
alternative, that we reverse and remand, we construe the issues to challenge
the legal and factual sufficiency of the evidence for findings related to
defamation, intentional infliction of emotional distress, malicious
prosecution, punitive damages, and mental anguish.  When both legal and factual sufficiency
challenges are raised on appeal, the court must first examine the legal
sufficiency of the evidence.  See
Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981) (per
curiam).

1  No EvidenceBLegal Sufficiency

We
address legal-sufficiency challenges as either "no-evidence" or
"matter-of-law" issues.  Gooch v. Am. Sling Co., 902 S.W.2d 181,
183-84 (Tex. App.BFort Worth 1995, no
writ).  We analyze the issue as a
"no-evidence" challenge when, as here, the party complaining on
appeal did not bear the burden of proof at trial.  Id. 

In
challenging the legal sufficiency of the evidence to support a finding on which
an adverse party, here Ortiz, bore the burden of proof, the appellant must show
the record presents no evidence to support the adverse finding.  Croucher v. Croucher, 660 S.W.2d 55,
58 (Tex. 1983). 

The final test for legal sufficiency must always be
whether the evidence at trial would enable reasonable and fair‑minded
people to reach the verdict under review. 
Whether a reviewing court begins by considering all the evidence or only
the evidence supporting the verdict, legal‑sufficiency review in the
proper light must credit favorable evidence if reasonable jurors could, and
disregard contrary evidence unless reasonable jurors could not."  

 








City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We will review the evidence "in the
light most favorable to the verdict, disregarding all contrary evidence that a
reasonable jury could have disbelieved." 
Ysleta Indep. Sch. Dist. v. Monarrez, 177 S.W.3d 915, 917 (Tex.
2005) (per curiam).  If the evidence
presented at trial would permit reasonable and fair-minded people to differ in
their conclusions, then jurors must be allowed to do so.  Keller, 168 S.W.3d at 822.  The trier-of-fact, whether the trial court or
the jury, remains the sole judge of the credibility of the witnesses and the
weight to be given to their testimony.  Id. at 819.  It may choose to believe one witness and
disbelieve another, and a reviewing court cannot impose its own opinions to the
contrary. Id.  "A reviewing
court cannot substitute its judgment for that of the trier-of-fact, so long as
the evidence falls within this zone of reasonable disagreement."  Id. at 822.  "[T]he court must consider evidence in
the light most favorable to the verdict, and indulge every reasonable inference
that would support it.  But if the evidence
allows of only one inference, neither jurors nor the reviewing court may
disregard it."  Id.  








We
overrule a legal-sufficiency issue if the record reflects any evidence of
probative force to support the finding.  ACS
Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997).  We sustain a legal-sufficiency challenge when
(1) the record establishes the complete absence of evidence of a vital fact,
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (4) the evidence
conclusively establishes the opposite of a vital fact.  Marathon
Corp. v. Pitzner, 106 S.W.3d 724,
727 (Tex. 2003) (per curiam); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711
(Tex. 1997); Hines v. Comm'n for Lawyer Discipline, 28 S.W.3d 697,
701 (Tex. App.BCorpus Christi 2000,
no pet.).  If there is more than a
scintilla of evidence to support the finding, the legal-sufficiency challenge
fails.  Formosa Plastics Corp. USA v.
Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.
1998). 

The
evidence is no more than a scintilla and, in legal effect, is no evidence
"[w]hen the evidence offered to prove a vital fact is so weak as to do no
more than create a mere surmise or suspicion of its existence."  Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983).  Suspicion linked to
other suspicion produces only more suspicion, not some evidence.  Pitzner,106 S.W.3d at 727-28; Browning-Ferris, Inc.
v. Reyna,
865 S.W.2d 925, 928 (Tex. 1993). 
Similarly, an inference stacked only on other inferences is not legally
sufficient evidence.  Pitzner,
103 S.W.3d at 728.  Conversely, more than
a scintilla exists when the evidence "rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions."  Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 25 (Tex. 1994).  We reverse and render judgment
when we sustain a legal-sufficiency point. 
Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 177 (Tex. 1986)
(per curiam); Heritage Res., Inc. v. Hill, 104 S.W.3d 612, 619 (Tex.
App.BEl Paso 2003, no pet).

2.  Factual Sufficiency








When
reviewing a jury verdict to determine the factual sufficiency of the evidence,
the party attacking a finding on which an adverse party bore the burden of
proof must show that the record presents "insufficient evidence" to
support the finding.  Gooch, 902
S.W.2d at 184.  We examine and consider
all the evidence.  Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406‑07 (Tex. 1998).  If we reverse a trial court's judgment on
factual‑sufficiency grounds, we detail all of the evidence relevant to
the issue and articulate why the finding is factually insufficient.  Maritime Overseas Corp., 971 S.W.2d at
407.  We reverse and remand for a new
trial when we sustain a factual‑sufficiency point.  Glover, 619 S.W.2d at 401.  

C.  AnalysisBThe Counterclaims

1.  Abuse of Process

Montemayor
sought and obtained a temporary restraining order from the trial court to
enjoin Ortiz, Celada, and Fernandez from hiding or secreting assets of Schor's,
pending further ruling by the trial court on the nature of that property.  Montemayor also sought and obtained an order
from the trial court ordering the appointment of a receiver for the principal
purpose of doing an inventory of Schor's assets and accounts.








Ortiz
contends that it was the process used in securing the ex parte appointment
of the receiver that was wrongful. 
Montemayor proceeded ex parte and is alleged to have submitted false
oaths and fatally defective pleadings reflecting that dissipation of the assets
of Schor's was threatened if quick action were not taken, despite the fact that
Montemayor knew of nothing to suggest risk of immediate dissipation or flight
by Ortiz.[10]  Ortiz contends that the alleged
misrepresentations in the affidavits constituted a wrongful use of the court
system and an abuse of process.[11]  As noted, no interlocutory appeal was ever
taken and the motion to vacate the receivership was not filed until October 18,
2002.  Ortiz raises no allegations that
the receiver acted outside the parameters of the court order or made false or
wrongful comments to customers.  The jury
found that by obtaining the ex parte receivership and/or the ex parte temporary
restraining order, Montemayor engaged in abuse of process which proximately
caused damages to Ortiz. 

Elements
of a claim for the tort of abuse of process include (1) an illegal, improper,
or perverted use of the process, neither warranted nor authorized by the
process, (2) an ulterior motive or purpose in exercising such use, and (3)
damage as a result of the illegal act.  Graham
v. Mary Kay, Inc., 25 S.W.3d 749, 756 (Tex. App.BHouston [14th Dist.]
2000, pet denied).  Montemayor, in issue
5, charges that none of these elements were established by Ortiz at trial.  








Abuse
of process is the malicious misuse or misapplication of process in order to
accomplish an ulterior purpose.  Baubles
& Beads v. Louis Vuitton, S.A., 766 S.W.2d 377, 378 (Tex. App.BTexarkana 1989, no
writ) (citing Restatement (Second) of
Torts ' 682 (1977); W. Keeton, Prosser and Keeton on The Law of
Torts ' 6 (5th ed.
1984)).  However, the critical aspect of
this tort remains the improper use of the process after it has been
issued.  Graham, 25 S.W.3d
at756.  Abuse of process exists where the
original process is used to accomplish an end other than that which the writ
was designed to accomplish.  Bossin v.
Towber, 894 S.W.2d 25, 33 (Tex. App.BHouston [14th Dist.]
1994, writ denied); see also Baubles & Beads, 766 S.W.2d at 378); Martin
v. Trevino, 578 S.W.2d 763, 769 (Tex. Civ. App.BCorpus Christi 1978,
writ ref'd n.r.e.).  Therefore, although
the tort of abuse of process requires a showing that Montemayor lacked probable
cause to institute proceedings, the ulterior motive required by that second
element does not supplant, supersede, or substitute for the illegal or improper
use of process required by the first element. 
McCall v. Tana Oil and Gas Corp., 82 S.W.3d 337, 348-49 (Tex.
App.BAustin 2001), rev'd
in part on other grounds, 104 S.W.3d 80 (Tex. 2003).  Both elements must be established along with
the third.  Id. (citing RRR
Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc., 957 S.W.2d 121, 134 (Tex. App.BHouston [14th Dist.]
1997, pet. denied)); Baubles & Beads, 766 S.W.2d at 378‑79; Martin,
578 S.W.2d at 769.

Where
process is used for the purpose for which it is intended, even though
accomplished by an ulterior motive, no abuse of process has occurred.  Baubles & Beads, 766 S.W.2d at 379.[12]  "If wrongful intent or malice caused the
process to be issued initially, the claim is instead one for malicious
prosecution."  Bossin, 894
S.W.2d at 33.[13]  








We
conclude there is no evidence of abuse of process and sustain Montemayor's
fifth issue on appeal.  

2.  Malicious Prosecution

In
his eighth issue, Montemayor alleges that no evidence or insufficient evidence
existed to sustain a jury finding of malicious prosecution.  Malicious prosecution is "generally
available against one who maliciously caused process to issue and without
probable or reasonable cause."  Martin,
578 S.W.2d at 769.  To prevail in a suit
alleging malicious prosecution of a civil claim, the plaintiff must establish
(1) the institution or continuation of civil proceedings against the plaintiff,
(2) by or at the insistence of the defendant, (3) malice in the commencement of
the proceeding, (4) lack of probable cause for the proceeding, (5) termination
of the proceeding in plaintiff's favor, and (6) special damages.  Tex. Beef Cattle Co. v. Green, 921
S.W.2d 203, 207 (Tex. 1996).  Among other
things, Montemayor urges that Ortiz failed to establish that the allegedly
wrongful action had terminated in her favor. 
Ortiz argues that the order setting aside the receivership is sufficient
to satisfy this element.[14]  








A
judgment can be considered final for purposes of issue and claim preclusion
prior to the taking of an appeal.  Id.  However, this rule is not extended to the
malicious prosecution context.  

Far from relieving
litigants and the judicial system of repetitive lawsuits with the possibility
of inconsistent results, we believe that extension of the Scurlock[15]
rule to malicious prosecution cases would actually promote repetitive and
unnecessary litigation because it would allow the plaintiff to prosecute a
claim only to have it rendered meaningless if later all or part of the appeal
of the underlying action is decided adversely. 

 

Id. at 207-08.  Accordingly,"an underlying civil suit
has not terminated in favor of a malicious prosecution plaintiff until the
appeals process for that underlying suit has been exhausted."  Id. 

Here,
the first order for partial summary judgment (that the claim was for one of
debt) issued on February 21, 2003; the second order for partial summary
judgment (dealing with the nature of the Schor's property) issued on May 27,
2003.  On August 11, 2003, an order was
entered severing that portion of the case from Ortiz's claims for damages.  The damage claims proceeded to trial in cause
number 2002-08-4040-B.  Subsequent to the
jury verdict in that matter, the parties returned to court and Ortiz sought and
obtained attorneys' fees in the declaratory judgment action under the original
cause number, 2002-05-2004-B.  Final
judgment in the matter involving the damage claims issued February 5,
2004.  No final judgment in the
declaratory judgment action issued until April 19, 2004, following the trial on
the issue of attorneys' fees.  Clearly,
the declaratory judgment portion of the suit had not terminated in Ortiz's
favor prior to the jury verdict and judgment awarding her damages for malicious
prosecution.  Moreover, both matters are
before this court on appeal simultaneously. 








We
conclude that the claim for malicious prosecution is premature, inasmuch as
there is no evidence that the prosecution complained of, and on which the
findings were based, had fully terminated in favor of Ortiz at the time the
matter was presented to the jury.[16]  We sustain Montemayor's eighth issue on
appeal.

3.  Defamation

To
recover for defamation, a private plaintiff must prove that the defendant (1)
published a statement, (2) that was defamatory to the plaintiff, (3) while
acting negligently as to the truth of the statement.  WFAA‑TV, Inc. v. McLemore, 978
S.W.2d 568, 571 (Tex. 1998).  A statement
is defamatory if it tends to injure one's reputation, exposing one to public
hatred, contempt, or ridicule, or financial injury or to impeach any person's
honesty, integrity, virtue, or reputation.  Tex. Civ. Prac. & Rem. Code Ann. ' 73.001 (Vernon
2005).  Libel is defamation expressed in
written form.  Id.  Slander is a defamatory statement that is
orally communicated or published to a third person without legal excuse.  Randall's Food Mkts., Inc. v. Johnson,
891 S.W.2d 640, 646 (Tex. 1995). 
Montemayor, in his sixth issue, complains that Ortiz tendered no
evidence or insufficient evidence that he published any false or defamatory
statements damaging her or her business, Schor's.[17]









The
jury charge inquired whether defendants [Montemayor] "published or caused to
be published, through their acts, statements or conduct, a defamatory Ex Parte
Temporary restraining order and defamatory Ex Parte Receivership over Becky
Ortiz, by engaging in conduct that was a proximate cause of injury to
her."[18]  Definitions were included for libel, a
defamatory statement, publication, negligently, and intentionally. 








Ortiz
bore the burden to show that Montemayor published the defamatory remarks that
damaged her.  WFAA-TV, 978 S.W.2d
at 571.  Ortiz alleges that the appointment
of the receiver itself was defamatory. 
Communications made in the due course of a judicial proceeding will not
serve as the basis of a civil action for libel or slander, regardless of the
negligence or malice with which they are made. 
James v. Brown, 637 S.W.2d 914, 916 (Tex. 1982).  This privilege extends to any statements made
by the judges, jurors, counsel, parties, or witnesses, and attaches to all
aspects of the proceedings, including statements made in open court, pre‑trial
hearings, depositions, affidavits, and any of the pleadings or other papers in
the case.  Id. at 916‑17.  The privilege extends to statements made in
contemplation of and preliminary to judicial proceedings.  Watson v. Kaminski, 51 S.W.3d 825, 827
(Tex. App.BHouston [1st Dist.]
2001, no pet.).  The Supreme Court has
also determined that a defense of legal justification will not be nullified
even by a finding of actual malice.  Tex.
Beef Cattle, 921 S.W.3d at 205. 
"Whatever a man has a legal right to do, he may do with impunity,
regardless of motive, and if in exercising his legal right in a legal way
damage results to another, no cause of action arises against him because of a
bad motive in exercising the right." 
Id. at 211.  "Improper
motives cannot transform lawful actions into actionable torts."  Id. 
Consequently, actions taken or statements made in conjunction with
pursuit of a temporary restraining order or appointment of a receiver will not
support a claim for defamation as a matter of law.  See James, 637 S.W.2d at 916. 

Ortiz
also alleges a second source of defamation, "general rumors."  Montemayor urges that the alleged rumors were
(1) "too vague" to meet the element of "falsity," and (2)
could not be attributed to him.  Ortiz
testified:

A:  We immediately got calls from people.  I mean, customers calling in, if we were
having a saleBif Schor's was
closing.  "What will you do if
Schor's is closing?  Where will we
buy?"  You knowBI mean, we had people
that thought that the Montemayors were going to be owning the store. "Oh
Becky the store will never be the same without you owning the store."  It was constant.  It was people coming, last week. To this day,
people are still, "How's everything going?" . . . 

 

Q:  Let's talk about other things that you saw in
the store in the time once Mr. Ransome had come in.  Tell us about customers that youBthat you've never seen
before that came in after that.  Tell us
about that.

 

A:  Well, I noticed BI guess that it was
that week, . . . and I just noticed people that I had never seen before, come
into the store, coming in just to kind of see. "We heard the rumors.  Something big was happening at Schor's.  Schor's is in trouble." And they would
come in just out of curiosity. . . .  We
knew by the way they came in, and the way they were looking to seeBokayB"What's this big
thing that is happening at Schor's." I mean, it was just very obvious.

 

Ortiz also testified
as follows:

 

Q:  And isn't it true, Mrs. Ortiz, that you have
testified before that neither Xavier Montemayor nor Tommy Graham ever said
anything bad about your business?








A:  I don't know if they have or not.  I don't think that they would say
anything.  I can't imagine anything.  I don't know.

 

Q:  That you have knowledge of.

 

A:  I have no knowledge that they said anything
to me directly, no.

 

Q:  And what you told this jury, you are not
saying that they went out to the public and said something bad about your
business, or disparage[d] it, or put it down in any form?

 

A:  No.  Just
indirectly with the receivership.

 

Q:  And that is just because of the receivership,
but they never said anything to anybody?

 

A:  No. 
It'sBit's the act of the
receivership.  

 

Q:  Now, isn't it true, that you testified that
what you did hear Mr. Montemayor say, was, that he didn't want to harm your
business, he didn't want to take your store, and he didn't want anything to do
wtih that.  You did hear that?

 

A:  Yes, I did.

 

Q:  That's what he said?

 

A:  Uh-huh.

 

Q:  Is that accurate?

 

A:  That's accurate, that's what I heard he said.

 

Q:  Do you recall testifying that Mr. RansomeBthat you did not know
whether Mr. Ransome had ever said anything false that damaged your businessBthat damaged you, or
your business?

 

A:  No.  I
mean, I know that he told people about what was going on at the store.

 

Q:  But do you recall testifying, that as far as
you knew, you did not know of anything false that he said that damaged you, or
your business?

 

A:  No

 








Q:  Is that accurate?

 

A:  That's accurate.  

 

Q:  And isn't it likewise for Mr. Graham that you
did not know of anything that he said false, that damaged your business?

 

A:  I don't.

 

Q:  Is that correct?

 

A:  No. 
Except for the receivership. 
That's it.  

 

Nothing
in this testimony confirms that Montemayor was the source of any of the alleged
rumors; nothing identifies any defamatory statements that could be attributed
to either Montemayor, Graham, or the receiver. 
The fact that a receiver was in the store taking an inventory was not a
rumor, but truth, and therefore communication of that fact could not have
constituted defamation.[19]  Further, we have concluded that the claims
for abuse of process and malicious prosecution cannot stand; therefore they
will not support a claim for defamation. 

While
we agree that a conditional or qualified privilege can be defeated with a
finding of actual malice at the time of publication, see Randall's Food
Mkts., 891 S.W.2d at 646, the privilege in the context of judicial
proceedings is absolute.








Any communication,
oral or written, uttered or published in the due course of a judicial
proceeding is absolutely privileged and cannot constitute the basis of a civil
action in damages for slander or libel. The falsity of the statement or the
malice of the utterer is immaterial, and the rule of nonliability prevails even
though the statement was not relevant, pertinent and material to the issues
involved in the case.

 

Reagan v. Guardian
Life Ins. Co., 166 S.W.2d 909, 912 (Tex. 1942). 
The privilege extends to pre-trial proceedings, including affidavits
filed with the court.  Bird v. W.C.W.,
868 S.W.2d 767, 771 (Tex. 1994).  A
witness is absolutely privileged to publish defamatory matter concerning
another in communications preliminary to a proposed judicial proceeding or as
part of a judicial proceeding in which he is testifying, if it has some
relation to the proceeding.  Id.  "[A]n absolute privilege confers
immunity regardless of motive whereas a conditional privilege may be lost if
the actions of the defendant are motivated by malice."   Hurlbut, 749 S.W.2d at 768. 

Here,
all alleged defamatory conduct arises solely in the context of judicial
proceedings, or in conjunction with the appointment or presence of the
receiver.  There are no allegations that
the receiver made statements to the public, outside of announcing his
court-appointed role, which would obviate the privilege.  Further, in any event, there must still be a
defamatory statement that was published and that is directly attributable to
the defendants.  There is no evidence
attributing such a statement to any of the appellants, or to the receiver.  Allegations of rumors generated by the
presence of the receiver, that cannot be attributed to a wrongful or defamatory
statement by appellants, will not suffice.

We
conclude the evidence for the claim of defamation is legally insufficient, and
sustain Montemayor's sixth issue on appeal. 


4.  Intentional Infliction of
Emotional Distress








In
his seventh issue, Montemayor challenges the award of damages for intentional
infliction of emotional distress, contending that Ortiz tendered either no
evidence or insufficient evidence of either "extreme and outrageous"
conduct or "severe emotional distress." 

To
recover damages for this type of tort, a plaintiff must establish that (1) the
defendant acted intentionally or recklessly, (2) the defendant's conduct was
extreme and outrageous, (3) the defendant's actions caused the plaintiff
emotional distress, and (4) the resulting emotional distress was severe.  Hoffman-LaRoche, Inc. v. Zeltwanger,
144 S.W.3d 438 , 445 (Tex. 2004) (citing Standard Fruit & Vegetable Co.
v. Johnson, 985 S.W.2d 62, 65 (Tex. 1998)). 
This tort is, first and foremost, a "gap‑filler" tort,
judicially created for the limited purpose of allowing recovery in those rare
instances in which a defendant intentionally inflicts severe emotional distress
in a manner so unusual that the victim has no other recognized theory of redress.  Creditwatch, Inc. v. Jackson, 157
S.W.3d 814, 816 (Tex. 2005) (citing Zeltwanger, 144 S.W.3d at 447).  The tort's "clear purpose" is
"to supplement existing forms of recovery by providing a cause of action
for egregious conduct" that might otherwise go unremedied.  Id. 
However, this "gap‑filler" tort "should not be
extended to circumvent the limitations placed on the recovery of mental anguish
damages under more established tort doctrines."  Zeltwanger, 144 S.W.3d at 447. 








Extreme
and outrageous conduct is conduct "so outrageous in character, and so
extreme in degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized
community."  Zeltwanger, 144
S.W.3d at 445 (citing Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993);
Restatement (Second) of Torts ' 46 cmt. d
(1965)).  Liability does not extend to
mere insults, indignities, threats, annoyances, petty oppressions, or other
trivialities.  Id. (citing GTE
Southwest, Inc. v. Bruce, 998 S.W.2d 605, 612 (Tex. 1999); Restatement (Second) of Torts ' 46 cmt. d (1965)).[20]  Emotional distress includes all highly
unpleasant mental reactions such as embarrassment, fright, horror, grief,
shame, humiliation, and worry.  GTE
Southwest, Inc., 998 S.W.2d at 618 (citing Washington v. Knight, 887
S.W.2d 211, 216 (Tex. App.BTexarkana 1994, writ
denied); Havens v. Tomball Cmty. Hosp., 793 S.W.2d 690, 692 (Tex. App.BHouston [1st Dist.]
1990, writ denied)).  Severe emotional
distress is distress that is so severe that no reasonable person could be
expected to endure it.  Id.  

Montemayor
alleges that no extreme or outrageous conduct occurred; instead, he sought only
the appointment of a receiver to inventory Schor's assets and accounts based
upon the legal presumption that all properties held by married persons are
"jointly managed community properties."  Montemayor relied upon the advice of counsel
and acted with approval of a state district judge in obtaining the relief.  He urges that the filing of suit and the use
of legal process issued by the court do not support a claim for intentional
infliction of emotional distress.  








Ortiz
confirmed she had testified that neither Graham nor Montemayor exhibited any
ill will or malice toward her, but that she later "corrected" that
testimony.  She believed they engaged in
illegal or unlawful activity specifically to harm her and to force her family
to pay Celada's debt.  She agreed
Montemayor told her he didn't want to harm her, but felt she was being used as
a "punching bag" for her husband and father-in-law.  She testified this wasn't her debt, and she
never borrowed from Montemayor.  Ortiz
confirms in her testimony that it was the act of securing the receivership that
caused her the distress and humiliation. 


It has not been enough
that the defendant has acted with an intent which is tortious or even criminal,
or that he has intended to inflict emotional distress, or even that his conduct
has been characterized by 'malice,' or a degree of aggravation which would
entitle the plaintiff to punitive damages for another tort.  

 

Brewerton v.
Dalrymple,  997 S.W.2d 212, 215 (Tex. 1999)
(citing Twyman, 855 S.W.2d at 621-22). 
"The conduct must be "so outrageous in character, and so
extreme in degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized community."  Id.; see also GTE Southwest, Inc.,
998 S.W.2d at 616 (holding that "it is not enough that the defendant has
acted with an intent that is tortious, malicious, or even criminal, or that he
has intended to inflict emotional distress;" the conduct itself must be
extreme and outrageous).  








The
Restatement (Second) of Torts ' 46 cmt. d (1965)
provides some illustrations of the type of conduct that might be considered
sufficiently extreme and outrageous. 
These include (a) a practical joke suggesting another's spouse has been
severely injured in an accident; (b) accusations made in front of others that
an employee has violated territorial restrictions, followed by a public demand
to tender all proceeds therefrom or risk being beaten up, having his truck
destroyed, and being put out of business; and (c) giving a woman a bathing suit
known to dissolve in water, causing her extreme embarrassment when she goes
swimming in the presence of new male and female acquaintances.[21]  See id.  Additional examples of extreme and outrageous
conduct arise where an actor is in a position of actual or apparent authority
over the other:  (a) a private detective
presenting himself as a police officer and threatening arrest on charges of
espionage unless certain letters are surrendered; (b) a school principal
accusing a student of immoral conduct, bullying her for an hour, and then
threatening prison and public disgrace; and (c) a creditor trying to collect a
debt by forwarding letters reviling debtor as a deadbeat, dishonest, a
criminal, and threatening lightening strikes, suits (that are never filed),
garnishment of wages, disruption at his job until he is discharged, as well as
physical threats.  See id.,
cmt. e.  An example of conduct that does
not rise to the level of extreme and outrageous is a creditor seeking to
collect on a debt, calling debtors names, speaking in a rude and insolent
manner, and indicating loss of trust.  Id.,
cmt. f. 








Here,
we are faced with a situation in which a person was sent into a business to
inventory goods, with the authority to monitor sales and purchases, but who was
never rude, insolent or interfering (other than by his mere presence and
authority).  Moreover, the presence of
this individual was court-sanctioned, and he never exceeded the parameters of
his appointment.  We are unable to
conclude that the pursuit of a remedy through legal process, however invasive,
or even injurious, constitutes outrageous conduct beyond the bounds of decency,
such as that which must be established to recover for intentional infliction of
emotional distress.  A party "must
have latitude to exercise these rights in a permissible way, even though
emotional distress results."  City
of Midland v. O'Bryant, 18 S.W.3d 209, 217 (Tex. 2000) (citing GTE
Southwest, Inc., 988 S.W.2d at 612); see also Gaspard v. Beadle, 36
S.W.3d 229, 237-38 (Tex. App.BHouston [1st Dist.]
2001, pet. denied).

The
Supreme Court found no evidence of extreme and outrageous conduct where
university administrators and employees made negative comments in a professor's
tenure file, denied the professor tenure, restricted his speech about his
tenure file, and assigned him an allegedly excessive course load.  Brewerton, 997 S.W.2d at 216. Wrongful
termination alone does not constitute extreme and outrageous conduct.  Southwestern Bell Mobile Sys., Inc. v.
Franco, 971 S.W.2d 52, 54 (Tex. 1998). 
Ordering an employee to immediately leave the premises, with a security
guard escort, does not rise to the level of extreme and outrageous
conduct.  Wornick Co. v. Casas,
856 S.W.2d 732, 735 (Tex. 1993).  A
company investigation, even assuming it used unethical methods, including false
implications that the police believed there may have been criminal activity and
contacts with other competing companies, the resulting termination of the
employee, and his inability to find another job, constituted no evidence of
extreme and outrageous conduct.  Tex.
Farm Bureau Mut. Ins. Co. v. Sears, 84 S.W.3d 604, 611 (Tex. 2002). 








[A]lthough a
defendant's motive or intent is relevant to an intentional infliction of
emotional distress claim, it is not enough to support liability. Rather,
"the conduct itself must be extreme and outrageous."  Accordingly, any punitive intent or personal
vendetta underlying Farm Bureau's post‑termination acts will not,
standing alone, support an extreme and outrageous finding.  Instead, we must examine Farm Bureau's conduct.

 

Id. (citations omitted).
In Sears, evidence reflected that there was a reasonable belief that
Sears was involved in some suspicious dealings; to find the resulting
investigation was extreme or outrageous "would be tantamount to imposing
liability for negligent infliction of emotional distress, a cause of action
that Texas does not recognize."  Id.  The court concluded there was no evidence of
extreme or outrageous conduct.  See
also Creditwatch, 814 S.W.2d at 817 n.20 (citing Sears, 84 S.W.2d at
612 (concluding that even a personal vendetta can be insufficient to constitute
intentional infliction of emotional distress if the act taken was not
outrageous)).

We
reach the same conclusion here.  There
was ample evidence before the court that Montemayor, whether or not
incorrectly, held a bona fide belief that the property of Shor's was community
property, and therefore accessible to him as a creditor.  There is evidence that Celada had, in the
past, taken steps to evade satisfaction of the outstanding debt.  The complained-of conduct, alleged to have
been extreme and outrageous, consisted of a remedy sought through the court
system.  The conduct was sanctioned by
court order.  There was no allegation of
conduct outside the parameters of that prescribed by the court; instead
argument was solely that the receivership was wrongfully secured. 








We
note the supreme court did find extreme and outrageous conduct in GTE
Southwest, Inc., 998 S.W.2d at 617, where the supervisor regularly
assaulted, intimidated, and threatened employees, creating a "den of
terror" through a pattern of ongoing harassment and abuse.  We find no evidence of such extreme conduct
in the record before us.  We conclude
there is no evidence of extreme and outrageous conduct, such that a claim for
intentional infliction of emotional distress cannot be maintained.  We sustain Montemayor's seventh issue on
appeal.[22]  

5.  Malice and Punitive Damages








The
jury determined that harm to Ortiz resulted from malice by both Graham and Montemayor.  The charge included a definition of clear and
convincing evidence, and a definition for malice.[23]  In the supplemental charge, the jury assessed
exemplary damages for that malicious conduct in the amount of $75,000 against
Montemayor, and $100,000 against Graham. 


We
cannot ignore that the finding of malice and the awards for punitive damages
were predicated upon findings of tortious conduct by Montemayor.  The purpose of punitive damages is to
"punish the defendant" and "for the added purpose of protecting
the public by [deterring] the defendant and others from doing such wrong in the
future."  Moriel, 879 S.W.2d
at 27 (citing Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 19
(1991)).  








The
jury instruction properly provided that the jury should consider the nature of
the wrong, the character of the conduct, the degree of culpability, the
situation and sensibilities of the parties concerned, and the extent to which
such conduct offends a public sense of justice and propriety.[24]  All considerations, however, were predicated
upon a finding of wrongdoing.  Inasmuch
as we have sustained Montemayor's issues on appeal relating to abuse of
process, malicious prosecution, defamation, and intentional infliction of
emotional distress, we conclude that there is no basis to award punitive
damages.  "Without evidence of
actual damages, punitive damages cannot be recovered."  Saenz v. Fid. & Guar. Ins.
Underwriters, 925 S.W.2d 607, 614 (Tex. 1996).  Accordingly, we sustain Montemayor's ninth
issue on appeal.[25]

6.  Mental Anguish

Mental
anguish damages may not be awarded without either "direct evidence of the
nature, duration, or severity of [plaintiffs'] anguish, thus establishing a
substantial disruption in the plaintiffs' daily routine," or other
evidence of "'a high degree of mental pain and distress' that is 'more
than mere worry, anxiety, vexation, embarrassment, or anger.'"  Id. at 614.  These types of damage awards are designed to
compensate non-economic losses.  Moore
v. Lillebo, 722 S.W.2d 683, 687 (Tex. 1986).  However, being a measure of damages and not a
finding of liability, mental anguish damages must also be predicated upon a
finding of wrongdoing.  "Mental
anguish consists of the emotional response of the plaintiff caused by the
tortfeasor's conduct."  Birchfield
v. Texarkana Mem. Hosp., 747 S.W.2d 361, 368 (Tex. 1987).  Where there is no tortious conduct, such an
award cannot stand.  Accordingly, we
sustain Montemayor's tenth issue on appeal, without reaching whether or not the
evidence was sufficient to support the jury's finding, had an underlying tort
been established.  

7.  Sufficiency of Evidence B Lost Profits, Damage
to Reputation








Because
of our conclusions with respect to Montemayor's fifth, sixth, seventh, and
eighth issues, we do not reach his eleventh issue, involving sufficiency of the
evidence for any causal connection between alleged lost profits and an act or
omission of Montemayor, or his twelfth issue, involving sufficiency of the
evidence to support an award for damage to reputation.  Tex.
R. App. P. 47.1. 

IV.  Conclusion

We
affirm the trial court's rulings relating to the motions for summary judgment
as reflected in appeal number 13-04-358-CV. 
We reverse the trial court's judgment in appeal number 13-04-224-CV,
based upon either no evidence to support the findings, and render that Ortiz
take nothing. 

 

ERRLINDA CASTILLO

Justice 

 

Concurring Opinion by 

Justice Linda Reyna
Yañez

 

Opinion delivered and
filed this


the 20th day of July,
2006.

 

 











[1] The trial court was required to
determine that the judgment was still valid and had not lapsed; it found that
sufficient writs of execution were issued during the interim time to maintain
its viability. 





[2] Graham testified that he formed a
belief in 1994-1995 that Schor's was community property.  He testified that in 1995, the amount of
principal and interest owed on the judgment was approximately $464,000, but he
had no information and made no inquiry as to the value of Schor's inventory at
that time.  He did not pursue Schor's at
that time because he "didn't think there was enough value there to get
into a fight about."  Ortiz was not
contacted because they did not want to give any warning that they were going to
try to collect against the community property. 






[3] Provisions were also included for
Ortiz to pay her staff and take a salary. 
The order also included language reflecting that it could not be used as
evidence or referred to in argument except to enforce its terms,
"including the Defendants' agreement to the appointment of the
receiver."  





[4] Determination of whether or not
Ortiz was personally liable is addressed below in conjunction with Montemayor's
issue three.  





[5] We note that objections to
Fernandez's discharge in bankruptcy based upon alleged fraudulent conduct were
necessarily filed prior to that court's findings that issued in November
1990.  We further note that any findings
of the bankruptcy court were limited to Fernandez, the debtor before it.  





[6] Cockerham v. Cockerham, 527
S.W.2d 162, 169 (Tex. 1975), involved application of the predecessor statute
which reads essentially the same as the current section 3.202.  See Act of June 2, 1969, 61st Leg.,
R.S., ch. 888, ' 1, sec. 5.61, 1969 Tex. Gen. Laws
2730.  





[7] Tex.
Fam. Code Ann. ' 3.102 (Vernon 1998).  See Act of June 2, 1969, 61st Leg.,
R.S., ch. 888, ' 1, sec. 5.22, 1969 Tex. Gen. Laws
2727.  





[8] The jury awarded damages as
follows: (a) $225,000 for past physical pain and mental anguish, (b) zero
dollars for future physical pain and mental anguish, (c) $50,000 for past lost
profits, (d) $10,000 for future lost profits, (e) $50,000 for past damage to
reputation, and (f) zero for future damage to reputation. 





[9]"The appointment of a receiver
without notice to the adverse party is one of the most drastic remedies
known," and should be exercised only in extreme cases where the rights are
clearly shown in a verified bill or affidavit and based upon facts and
circumstances rather than opinions and conclusions.  Allegations must be verified positively and
not upon information and belief.  Wilkenfeld
v. State, 189 S.W.2d 80, 82 (Tex. Civ. App.BGalveston 1945, no writ).  Immediate remedy is available by
interlocutory appeal.  See Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(1) (Vernon Supp.
2005).  





[10] Ortiz also contends the affidavits
were defective inasmuch as they were based upon speculation and
"information and belief," rather than fact.  





[11] Montemayor argued at all times
that the threat of dissipation by the other two named defendants, Fernandez and
Celada, was very real.  Montemayor did
not urge that Ortiz was the type of person to conceal or hide assets, but
instead that Celada could access Schor's since it was community property,
thereby placing its assets at risk. 
Throughout all court proceedings, Montemayor maintained he had a
justifiable belief that Schor's was indeed community property.  





[12] See also J.C. Penney Co. v.
Gilford, 422 S.W.2d 25, 31 (Tex. Civ. App.BHouston [1st Dist.] 1967, writ
ref'd n.r.e.) ("[A]n action for abuse of process cannot be maintained
where the process was employed to perform no other function than that intended
by law.  The mere issuance of process is
not actionable as an abuse of process."). 





[13] Case law addressing the wrongful
issuance of an injunction (which was also claimed in this matter) is also
illustrative.  A person can bring two
separate types of causes of action for wrongful injunction, one upon the bond
ordinarily filed to obtain the injunction, and the other for malicious
prosecution.  The two actions differ in
the kind of wrong which must be shown to establish liability and in the amount
of recovery.  DeSantis v. Wackenhut
Corp., 793 S.W.2d 670, 686 (Tex. 1990) (superseded by statute on other
grounds).  

 

A cause of action upon an
injunction bond is predicated upon a breach of the condition of the bond. That
condition, as prescribed by Rule 684, Texas Rules of Civil Procedure, is
"that the applicant will abide the decision which may be made in the
cause, and that he will pay all sums of money and costs that may be adjudged
against him if the restraining order or temporary injunction shall be dissolved
in whole or in part." To prevail upon this cause of action, the claimant
must prove that the temporary restraining order or temporary injunction was
issued or perpetuated when it should not have been, and that it was later dissolved.  The claimant need not prove that the
temporary restraining order or temporary injunction was obtained maliciously or
without probable cause.  The purpose of
the bond is to protect the defendant from the harm he may sustain as a result
of temporary relief granted upon the reduced showing required of the injunction
plaintiff, pending full consideration of all issues. . . .  The only other cause of action for wrongful
injunction is for malicious prosecution. 
"'It is established by the weight of authority that in the absence
of elements of an action for malicious prosecution no action will lie by the
defendant in an injunction suit, independently of a bond or undertaking, for
damages for the wrongful suing out of the injunction.'"  To prevail upon this cause of action the
claimant must prove that the injunction suit was prosecuted maliciously and
without probable cause, and was terminated in his favor.  

 

Id. at 685-86 (citations omitted).  





[14] On appeal, Ortiz argues that the
receivership was set aside because it was obtained on false or improper
allegations.  The record does not reflect
any such finding.  





[15] Scurlock Oil Co. v. Smithwick,
724 S.W.2d 1, 6 (Tex. 1986).  





[16] Further, the appeal on the matter
does not conclude until the issuance of this opinion.  





[17] An action for injurious falsehood
or business disparagement is similar in many respects to an action for
defamation.  Both involve the imposition
of liability for injury sustained through publications to third parties of a
false statement affecting the plaintiff. 
"The two torts, however, protect different interests.  The action for defamation is to protect the
personal reputation of the injured party, whereas the action for injurious
falsehood or business disparagement is to protect the economic interests of the
injured party against pecuniary loss." 
Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766 (Tex.
1987).  The elements of a claim for
business disparagement are publication by the defendant of disparaging words,
falsity, malice, lack of privilege, and special damages.  Prudential Ins. Co. v. Fin. Review Servs.,
Inc., 29 S.W.3d 74, 82 (Tex. 2000). 
Regarding damages, the common law required a plaintiff in a defamation
action to prove special damages in only a limited number of situations, whereas
pecuniary loss to the plaintiff must always be proved to establish a cause of
action for business disparagement.  Hurlbut,
749 S.W.2d at 766.  Here, no separate
question was submitted on business disparagement.   





[18] Testimony reflected that Mr.
Ransome was appointed receiver for the sole purpose of conducting an inventory
of the assets of the business.  That
process took approximately seven to ten days, ended in June 2002, and he never
returned to the store after that.  He did
remain in the position of receiver, with authority to overview transactions and
halt anything that seemed outside of normal day-to-day operations until the
receivership was dissolved in December 2002 (the formal order was signed
January 8, 2003).





[19] Truth is a complete defense to
defamation.  Randall's Food Mkts. v.
Johnson, 891 S.W.2d 640, 646 (Tex. 1995). 
Proving falsity in a defamation case is the plaintiff's burden of proof;
in such a case, the defendant does not have the burden of proving substantial
truth as an affirmative defense.  Hearst
Corp. v. Skeen, 159 S.W.3d 633, 637 n.1 (Tex. 2005) (per curiam) (citing Bentley
v. Bunton, 94 S.W.3d 561, 586‑87 (Tex. 2002)).

 





[20] The jury charge inquired whether
Montemayor intentionally inflicted severe emotional distress, and included
definitions of "extreme and outrageous conduct," and intentional or
reckless conduct.  It also included an
instruction that the tort only occurs when the emotional distress suffered was
severe, but it did not define"severe" distress.





[21] Other examples of conduct that
qualifies as extreme and outrageous, as to be atrocious and utterly intolerable
in a civilized society, address circumstances where an actor has knowledge of
another's peculiar susceptibility by reason of some physical or mental
condition and takes advantage of that knowledge to cause the distress.  Restatement
(Second) of Torts ' 46 cmt. f (1965).  





[22] We pause to address the question
of the severity of Ortiz's distress. The receivership happened at about the
same time she was seeking a divorce from Celada.  She testified that when she learned of the
receivership, she was stunned, shocked, and could not talk.  She was humiliated; many persons approached
her at various events to express concern and support.  She worried about her store closing and that
her reputation, which had been impeccable, was harmed.  She felt invaded, abused, and scared.  She testified she could not sleep, cried at a
moment's notice, got stomach and chest pains, and felt depressed.  She did see her doctor (gynecologist),
complaining of stress and marital discord, and he prescribed sleeping pills and
some anti-depressants.  On
cross-examination, she conceded she never visited a psychiatrist, and was told
by another doctor (to whom she also complained about stress due to getting a
divorce) to exercise instead of taking anti-depressants.  

 

As noted above, to prevail on this claim, a
plaintiff must establish that emotional distress is severe.  GTE Southwest, Inc., v. Bruce,
998 S.W.2d 605, 618 (Tex. 1999). 
Feelings of anger, depression, and humiliation are insufficient evidence
of severe distress.  Regan v. Lee,
879 S.W.2d 133, 136-37 (Tex. App.BHouston [14th Dist.] 1994, no writ) (per curiam).  Ortriz testified that her embarrassment
hindered her business and her relations with customers during the presence of
the receiver in her office; she testified she experienced sleeplessness, and
some depression.  However, she did not
testify that her distress was unendurable. 
She testified she carried on because she had to be strong for her
children.  The record also reflects that
during the time in which she is alleged to have sustained mental anguish damages,
she worked to maintain her business by focusing more on in-home decorating
services rather than on jewelry sales. 
There is no testimony that she was unable to perform well in these
one-on-one relations with her clients and, indeed, her skill in personal
relations appears to be one of the strengths of her business.  During this period, business revenues
remained relatively constant, despite alleged disruptions in the store, because
she was able to perform these other services. 
We conclude that there is legally insufficient evidence that the
distress she sustained constituted "severe distress" as it is
currently defined.  





[23] The charge defined malice to mean
"a specific intent" or "an act or omission" by either
Montemayor or Graham which, "when viewed objectively from the standpoint
of at [sic] the time of its occurrence, involved an extreme degree of risk,
considering the probability and magnitude of the potential harm to others; and
of which Montemayor or Graham had actual subjective awareness of the risk
involved, but nevertheless proceeded with conscious indifference to the rights,
safety or welfare of others."





[24] The charge also permitted
consideration of the net worth of Montemayor and Graham.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 41.011 (Vernon 1997). 






[25] We do not reach whether evidence
was sufficient to sustain the awards for punitive damages, in the event the
underlying foundational tort were found to exist.